UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM CODY, | 4:22-CV-04010-KES |
| Plaintiff, | |
| vs. | 1915A SCREENING |
| DOUG CLARK, individual and official capacity; DANIEL SULLIVAN, individual and official capacity; JENNIFER DREISKE, individual and official capacity; BRITTNEY LENGKEEK, individual and official capacity; SAM BADURE, individual and official capacity; JEFFREY ELTON, individual and official capacity; JENNIFER FENOLIO, individual and official capacity; TROY PONTO, individual and official capacity; TIM REISCH, individual and official capacity; DARIN YOUNG, individual and official capacity; JOHN BENTING, individual and official capacity; MIKE LEIDHOLT, individual and official capacity; NYLA SPRINKEL, individual and official capacity; JOHN/JANE DOES, individual and official capacities; MARY CARPENTER, individual and official capacity, | |
| Defendants. | |

Plaintiff, William Cody, an inmate at the South Dakota State Penitentiary, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. This court granted Cody leave to proceed in forma pauperis and ordered him to pay an initial filing fee. Docket 7. Cody paid his initial filing fee on March 3, 2022. Cody has filed two motions to supplement his complaint and attached

his proposed supplemental complaints. Dockets 8, 8-1, 12, 12-1. Because Cody's complaint has not yet been served on defendants, this court grants Cody's motions to supplement. This court will now screen Cody's complaint under 28 U.S.C. § 1915A.

## I.    1915A Screening

### A.    Factual Background

The facts alleged in Cody's complaint are: that several conditions at the penitentiary violate Cody's rights. *See* Docket 1 ¶¶ 23-163.

#### 1.    Diabetes Management Issues

Cody claims that he was diagnosed with Type 2 diabetes on May 1, 2003, which has caused increased numbness and pain in his feet because of peripheral neuropathy. Docket 1 ¶ 23. He claims that since 2011, he has had increasing dizziness, and he was diagnosed with Sjögren's Syndrome on December 16, 2019, which can cause neuropathy. *See id.* ¶¶ 24-25. Cody alleges that on February 21, 2020, he was provided a cane by his attending physician at the penitentiary, Dr. Eugene Regier, because of his increased dizziness. *Id.* ¶ 26. He alleges that his neuropathy and dizziness were also worsened by a vitamin B12 deficiency, a lack of protein because of his diet, and contracting COVID-19 in 2020. *Id.* ¶¶ 27-28. Cody states that as a result of these ailments, he struggles to walk, stand, and even sit up straight for periods of time, which can sometimes be as short as a few minutes. *Id.* ¶ 29. He also states that he bruises his arms when he stumbles against walls or objects. *Id.*

¶ 30. Cody claims that nurses at Health Services observed those bruises in June, July, and August 2021. *Id.* ¶¶ 31-33.

Cody alleges that he was examined by Dr. Jeffrey W. Boyle of Avera Neurology on September 20, 2021, who attributed his balance issues to his various conditions. *Id.* ¶ 34. He alleges that Dr. Boyle reported that "[i]f [Cody] goes from a sitting to a standing position he will have trouble." *Id.* (quoting Docket 1-1 at 10). Cody claims that an echocardiogram in October 2021 revealed calcification of the aortic valve leaflets and reduction of excursion of the leaflets, which Dr. Regier told him was troubling and could be contributing to his dizziness. *Id.* ¶ 35. He claims that later tests that month showed "a 30 point reduction in systolic blood pressure upon sitting from prone and another 30 point reduction when standing." *Id.* ¶ 36.

Cody states that he has been prescribed Lyrica for neuropathic pain caused by diabetes. *Id.* ¶ 37. He states he is to take Lyrica three times a day with meals. *Id.* ¶ 38. He also states that medications take a minute or two to be disbursed and that insulin injections take longer, which can result in medication lines of up to twenty inmates. *Id.* ¶¶ 39-40. Cody claims that under a new rule posted around March 2021, he was required to obtain his Lyrica before entering the dining hall. *Id.* ¶ 41. He claims that waiting in long medication lines was difficult because of his balance issues and foot pain. *See id.* ¶ 48. He also claims that Unit Manager Sam Badure offered him a walker-chair to use while waiting in the medication line, but because a walker-chair would require him to repeatedly stand, move the walker-chair, and sit, he

3

declined it. *Id.* ¶ 50. Cody alleges that Badure "harbored animus toward him" because Cody helped a fellow inmate with court filings as a prisoner advocate. *Id.*

Cody claims that he submitted an inmate Americans with Disabilities Act ("ADA") accommodation request on May 18, 2021, asking to be let out early for meals to avoid medication lines, and that this request was denied on June 11, 2021, by former Facility ADA Coordinator Jennifer Dreiske.[1] *Id.* ¶ 42. Cody alleges that the two inmates in cells next to his are released every evening five to ten minutes before Cody because they work as a laundry orderly and on the recreation crew. *Id.* ¶ 43. He alleges that he has received disciplinary reports on several occasions for leaving the dining hall before entering the medication line. *Id.* ¶ 44. He also alleges that further efforts to receive an ADA accommodation to help him receive treatment were unsuccessful. *See id.* ¶¶ 45, 53-55. Cody states that he stopped taking Lyrica because further disciplinary reports would result in fines, and his failure to take Lyrica caused him pain that often disrupted his sleep. *Id.* ¶ 46. He states that he requested an ADA accommodation to allow him to return to his cell early from recreation periods, which Lengkeek granted on November 2, 2021. *Id.* ¶¶ 57-58.

---

[1] Cody brings claims against Jennifer Dreiske, the former Facility ADA Coordinator, in her individual and official capacity. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). The current Facility ADA Coordinator is Brittney Lengkeek, who is automatically substituted for Dreiske on the official capacity claims.

Cody alleges that he was examined by Dr. Oday Karadsheh of Avera Medical Group Endocrinology on December 30, 2021. Docket 8-1 ¶ 2. He alleges that Dr. Karadsheh changed his diabetes regimen because of his "body changes and complications." *Id.* ¶ 4. He states that Dr. Karadsheh recommended 2-3 finger sticks in the morning and 1-2 in the afternoon or evening to monitor blood sugar and a daily insulin injection. *Id.* He also states that after he told Dr. Karadsheh of the difficulties he was having following his diabetes regimen at the penitentiary, Dr. Karadsheh wrote a letter explaining that "uncontrolled diabetes will put the patient at higher risk of medical complication including but not limited to heart disease, stroke, and severe infection which may lead to amputations" and that "[u]nrecognized hypoglycemia – if not treated – could cause death." *Id.* ¶¶ 7-8 (quoting Docket 8-2 at 9).

Cody states that despite Dr. Karadsheh's recommendations and letters, medical staff at the penitentiary did not know of his new insulin requirements and were not tracking his blood sugar numbers. *Id.* ¶ 10. He states that he received an order for blood sugar checks three times each day but that he was still not receiving proper care because he had not received ADA accommodations that would let him receive care, so he attempted to meet with Dr. Regier's replacement. *Id.* ¶¶ 11-14. Cody claims that Registered Nurse Liz Townsend came to his cell on January 28, 2022, to discuss Cody's diabetes treatment. *Id.* ¶ 16. He claims that Townsend had learned that he had been testing his blood sugar "twice per day only a few times and not even once every

5

day" and that he had not received any insulin since December 30, 2021. *Id.*
Cody alleges that he explained to Townsend that he wanted treatment, but
because he was physically unable to stand in long medication lines, he could
not receive it. *Id.* He also alleges that his request to be released from his cell
earlier in order to avoid long medication lines as an ADA accommodation was
denied by Lengkeek on February 9, 2022. Docket 12-1 ¶ 5.

### 2. Dining Hall Issues

Cody claims that he has been authorized to sit in the handicapped
section of the penitentiary dining hall for the past few years and that because
he could not stand in line, inmate Norman Stumes was assigned to get Cody's
meals and bring them to his table. Docket 1 ¶¶ 61-62. He claims that Sergeant
Jeffrey Elton issued a disciplinary report dated September 20, 2020, alleging
that Cody and Stumes did not have authorization to eat alone together, even
though Dr. Regier and penitentiary staff had in fact authorized this
arrangement. *Id.* ¶¶ 63-64. He also claims that he complained to Lieutenant
Perrett and that Unit Manager Cody Hanson told him that the disciplinary
report had been dismissed. *Id.* ¶ 65. He alleges that, despite this, on November
12, 2021, Elton still refused to allow Cody to sit in the handicapped section of
the dining room and refused to allow Stumes to help with his meals. *Id.* ¶¶ 66-
67.

Cody alleges that he was forced to leave the dining hall without his meal
that day, and because his age and health left him especially at risk to COVID-
19, he could not attend subsequent meals supervised by Elton because he

6

could not sit at a table with three other potentially unvaccinated inmates. *Id.* ¶¶ 68-70, 72. Cody alleges that Elton's treatment of him was motivated by Cody's disability and by the humiliation faced by Elton when his disciplinary report was exposed as false by Perrett and Hanson. *Id.* ¶ 73. He also alleges that he wrote letters complaining of this treatment to Interim Secretary of Corrections Tim Reisch[2] and Interim Warden Doug Clark,[3] but the letter Cody received in response ignored his complaints about Elton. Docket 8-1 ¶ 23.

### 3.   Health Services' Waiting Room Conditions

Cody states that the penitentiary's COVID-19 procedures were insufficient, exposing him to unnecessary risk, after the penitentiary stopped requiring masks on July 24, 2021. *See* Docket 1 ¶ 74. He states that penitentiary inmates and staff were aware on November 13, 2021, that there were active cases of COVID-19 within the penitentiary. *Id.* ¶ 75. He states that he was called to Health Services that morning to discuss the kite he had sent the previous day regarding Elton and his authorization to eat separately with Stumes. *See id.* ¶ 77. Cody claims that the Health Services waiting room, which is about 12 by 15 feet, had 13 other inmates and that Correctional Officer Jennifer Fenolio, who escorted him to the waiting room, was responsible for the

---

[2] Cody brings claims against Tim Reisch, the former Interim Secretary of Corrections, in his individual and official capacity. The current Secretary of Corrections is Kellie Wasko, who is automatically substituted for Reisch on the official capacity claims. *See* Fed. R. Civ. P. 25(d).

[3] Cody brings claims against Doug Clark, the former Acting South Dakota State Penitentiary Warden, in his individual and official capacity. The current warden is Dan Sullivan, who is automatically substituted for Clark on the official capacity claims. *See* Fed. R. Civ. P. 25(d).

overcrowding that day, as well as unknown John/Jane Does #2(b). *Id.* at ¶¶ 77-79. He also claims that he had previously complained about overcrowding in the waiting room, which continues to this day, and had refused to stay there for an extended period of time on at least two prior occasions. *Id.* ¶¶ 77, 79. Cody alleges that he asked Fenolio for permission to return to his cell, but she said that she could not escort him because she was the only officer available. *Id.* ¶ 83. He alleges that he had to wait about two hours and that he was forced to go to Health Services because of Elton's denial of his ADA accommodation request. *See id.* ¶¶ 77, 85-86.

### 4.    Quarantine Conditions

Cody claims that he learned that afternoon that he was to be quarantined because one of the people at Health Services that morning had tested positive for COVID-19. *Id.* ¶¶ 88-89. He claims that he was first told that he could stay in his own single cell in Federal Hall, but he was then told he would be transferred to East Hall to be celled with another inmate who had been exposed to COVID-19 that morning. *See id.* ¶¶ 87, 90, 93. Cody alleges that he asked for an N95 mask but never received a response to this request. *Id.* ¶ 95. He alleges that he made a list of the 17 people whom he had been in contact with since leaving Health Services, but no one ever requested this list. *Id.* ¶ 97. Cody states that he was moved into his new cell that evening and that his new roommate had a chest tube for antibiotics for a sore on his leg. *Id.* ¶ 99. He states that despite the risk to him and his roommate, the officer who visited the cell to take his roommate for medication did not wear a mask or

gloves. *Id.* He also states that many inmates and staff passing near or visiting the quarantined cells did not wear gloves or masks. *Id.* ¶ 103, 112, 121.

Cody alleges that the cell in which he was quarantined contained a triple bunk that only had 13 inches of space between the mattress and the bed above it. *Id.* ¶ 100. He alleges that he had to roll in and out of the bunk and often had to sit on the toilet to drink, eat, or watch TV because the cell only had one chair. *Id.* ¶ 101. He also alleges that inmates in other cells in East Hall yelled and had their televisions on overnight and that officers did not enforce the posted rule requiring use of headphones while watching television, making it more difficult for him to sleep. *Id.* ¶ 102, 130. Cody states that his inability to rest while supporting his head and neck caused increasing dizziness and nausea that persist to this day. *Id.* ¶ 107. He states that he was not allowed regular showers, even though other quarantined inmates showered every day, and that he was only offered four showers during the first nine days of his quarantine. *Id.* ¶¶ 111, 113, 123, 128.

Cody states that these conditions caused him to be unable to walk more than a few feet before being too dizzy to stand, subjecting him to discipline because he could not stand for the ten to twelve minutes required for standing counts. *Id.* ¶ 117. He states that he complained about these conditions to Deputy Warden Troy Ponto on November 18, 2021, and he was moved to a single cell that day that he describes as "filthy, but [able to be] cleaned well enough to become acceptable for the 5 or 6 days remaining." *Id.* ¶¶ 120, 122. Cody claims that on November 19, 2021, he was extremely dizzy when sitting

on his bed with his feet on the floor, after resting in a supported prone position for over two hours. *Id.* ¶ 127. He claims that he laid down for another hour, then sat up, waited, stood, and tried to walk. *Id.* Cody alleges that he could not walk in a straight line and sat back down in his chair. *Id.* He alleges that it took over an hour for him to recover and that this condition is now "fairly permanent[.]" *Id.* He also alleges that medical notes from November 23, 2021, described "evidence of significant deterioration of diabetic control[.]" Docket 8-1 ¶ 24.

Cody claims that he received a major disciplinary report as a result of these conditions. *See* Docket 1 ¶ 104-105. He claims that he was "woken from a labored sleep" the morning of November 15, 2021, by a nurse with a Lyrica pill. *Id.* ¶ 104. Cody alleges that, dizzy and not fully cognizant, he rolled out of his bed, put the pill in his mouth, took a drink of water, opened his mouth to show the officer that he had swallowed the pill, and went back to sleep. *Id.* He alleges that he received a disciplinary report for violating a major DOC rule for "not float[ing] his meds[,]" a mistake he attributes to his condition that morning, and that the report suggests he must be more closely monitored when he is given Lyrica. *Id.* ¶ 105, 126.

### 5.   Economic Impact Payment Garnishment

Cody states that he was eligible to receive Congressionally authorized economic impact payments during the pandemic. *See id.* ¶¶ 138-139. Specifically, he states that he was to receive $1,200 in Coronavirus Aid, Relief, and Economic Security Act stimulus money, $600 in Consolidated

Appropriations Act stimulus money, and $1,400 in American Rescue Plan Act money. *See id.* ¶ 138. Cody claims that he received his entire $1,400 American Rescue Plan Act payment on April 23, 2021, but that instead of receiving $1,800 from the other two payments, he received $1801.04 on May 3, 2021, and $1,550.99 of that was deducted for "obligation payments[.]" *See id.* ¶¶ 141, 146. He claims that the additional $1.04 was "fraudulently fabricated" by unknown John/Jane Does #3. *Id.* ¶ 147. He also claims in an attached grievance that $160 went to his spending account, $90.05 to his savings account, and $360.21 went to his Prison Litigation Reform Act debt, but the remaining $1,190.78 was taken for other obligations. *See* Docket 1-1 at 60.

Cody alleges that his debt would regularly be reduced to $100 at his yearly classification review, and that his total debts in April 2021 were $251.86. Docket 1 ¶ 142. He alleges that he wrote to former Warden Darin Young,[4] and he received a response from Associate Warden John Benting denying his request to reduce his debt of $251.86 to $100. *Id.* ¶¶ 142-143. He also alleges that he wrote Nyla Sprinkel, Supervisor for Inmate Accounts, about this issue, and he received a reply from Sprinkel stating that "loans are written off down to $100 . . . this done during summer months." *Id.* ¶¶ 144, 149 (omission in original) (quoting Docket 1-1 at 55). Cody connects this procedure to the garnishment of his economic impact payments, alleging that former

---

[4] Cody brings claims against Darin Young, the former South Dakota State Penitentiary Warden, in his individual and official capacity. The current warden is Dan Sullivan, who is automatically substituted for Young on the official capacity claims. *See* Fed. R. Civ. P. 25(d).

Secretary of Corrections Mike Leidholt[5] and John/Jane Does #3 in Pierre created this procedure in order to put these payments towards the existing debt before writing it off. *See id.* ¶¶ 145, 150.

Cody states that, according to Sprinkel, the payment was a "tax refund" and not an "economic impact payment" and thus could be garnished. *Id.* ¶ 152. He states that a later memo sent by the DOC stated that "[t]ax returns and stimulus payments are not exempt from garnishment and will be processed as a normal incoming mail deposit." *Id.* ¶ 154. He also states that fellow inmate, David Bradley, only had $750 of his first two stimulus payments totaling $1,800 garnished. Docket 8-1 ¶ 27; Docket 12-2 at 7.

### 6.   Vocal Cord Issues

Cody claims that he visited Dr. Daniel W. Wood of Midwest Ear, Nose & Throat on October 24, 2019. Docket 1 ¶ 158. He claims that he was diagnosed with "poor projection, raspy, and rough" voice quality that had a significant impact on vocal function. *Id.* (quoting Docket 1-1 at 69). He also claims that a flexible endoscopy revealed a "weak" left vocal cord and that Dr. Wood recommended "a left thyroplasty[.]" *Id.* (quoting Docket 1-1 at 72). Cody alleges that Dr. Regier requested this procedure and that Dr. Mary Carpenter, who had final approval authority at Correctional Health Services, rejected Dr. Regier's

---

[5] Cody brings claims against Mike Leidholt, the former Secretary of Corrections, in his individual and official capacity. The current Secretary of Corrections is Kellie Wasko, who is automatically substituted for Leidholt on the official capacity claims. *See* Fed. R. Civ. P. 25(d).

request for this procedure because it was a benign condition and because the surgery would only improve voice quality. *Id.* ¶¶ 21, 159.

Cody alleges that this condition worsened to the point that "it was becoming increasingly difficult to yell for help or even to call to get his cell door opened[,]" and in July 2021, he requested another evaluation from Dr. Wood. *Id.* ¶¶ 160-61. Cody states that Dr. Regier submitted this request, and Dr. Carpenter denied the request, deeming the procedure not medically necessary. *Id.* ¶ 161. He alleges that Dr. Regier submitted another request for an Ear, Nose, and Throat consultation on September 9, 2021, which Dr. Carpenter rejected on September 28, 2021. *Id.* ¶ 162. He also states that his worsening condition places more stress on his right vocal cord and risks permanent loss of speech. *Id.* ¶ 163.

### 7.   Noise Issues

Cody alleges that Badure was indifferent to his complaints regarding noise issues in East Hall and then Federal Hall. Docket 8-1 ¶ 25. He alleges that Badure has been moving inmates directly from segregated housing into Federal Hall and failing to enforce noise rules in Federal Hall, resulting in increased noise. *Id.* He also alleges that he spoke with Badure on January 26, 2022, to discuss noise issues, but she only told him to inform an officer when there was a television on without headphones. *Id.* Cody states that he continued to complain about the noise level steadily increasing and preventing him from sleeping, but no prison officials have made any effort to address the

13

issue. *Id.* ¶ 26; Docket 12-1 ¶¶ 8-11. He states that he brought some of these complaints to Associate Warden Chad Rotert. Docket 12-1 ¶¶ 9-11.

Cody brings claims against Clark, Dreiske, Reisch, Young, and Leidholt[6] in their individual capacities and against all other defendants in their individual and official capacities. *See* Docket 1 ¶ 4; Docket 12-1 at 1.[7] He seeks several forms of declaratory and injunctive relief, money damages, and other relief that this court deems just. Docket 1 at 43-48; Docket 8-1 at 14-15.

### B.   Legal Background

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Pro se and civil rights complaints must be liberally construed. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a pro se complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir.

---

[6] Because Lengkeek has been substituted for Dreiske, Sullivan has been substituted for Clark and Young, and Wasko has been substituted for Leidholt and Reisch in their official capacities under Federal Rule of Civil Procedure 25(d), the claims against Dreiske, Clark, Young, Leidholt, and Reisch are in their individual capacities only. Claims that have been brought against Lengkeek, Sullivan, and Wasko because they have been substituted for other defendants are brought against Lengkeek, Sullivan, and Wasko in their official capacities only. *See* Fed. R. Civ. P. 25(d).

[7] Cody names Wasko and Rotert as defendants in his second supplemental complaint. Docket 12-1 ¶¶ 3-4. Although he does not indicate the capacities in which he brings claims against Wasko and Rotert in the body of his second supplemental complaint, he does list them as defendants "officially and in their Individual capacities" in the caption. *Id.* at 1. Thus, he brings these claims against Wasko and Rotert in their official and individual capacities.

1985) (citation omitted); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). If it does not contain these bare essentials, dismissal is appropriate. *See Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Twombly* requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true[.]" *Twombly*, 550 U.S. at 555 (internal citation omitted); *see also Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008) (noting that a "complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory"). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The court will now assess each individual claim under 28 U.S.C. § 1915A.

### C.   Legal Analysis

#### 1. Official Capacity Claims for Money Damages

Cody brings claims against all defendants except Clark, Dreiske, Young, Leidholt, and Reisch in their official capacities. *See* Docket 1 ¶ 4. All

defendants were employees of the state of South Dakota at the times in question. *Id.* ¶¶ 5-21; Docket 12-1 ¶¶ 3-4. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* Here, Cody requests both money damages and injunctive relief. The state of South Dakota has not waived its sovereign immunity. Thus, Cody's claims for money damages against all defendants except Clark, Dreiske, Young, Leidholt, and Reisch in their official capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

## 2. Official Capacity Claims for Injunctive Relief and Individual Capacity Claims

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for

> an inferior officer's constitutional violation only if he directly
> participated in the constitutional violation, or if his failure to train
> or supervise the offending actor caused the deprivation.

*Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up). Cody's

individual capacity claims must allege that each individual defendant either

participated in the unconstitutional conduct or caused the conduct to occur

through a failure to train or supervise the offending actor.

### a.      Medical Care Denial Claims

Cody brings claims against Sullivan, Lengkeek, and Badure in their

individual capacities and in their official capacities for injunctive relief and

against Clark and Dreiske in their individual capacities for denying him access

to prescribed pain medications, blood sugar testing, and insulin in violation of

his right to be free from discrimination because of his disability under Title II of

the ADA, his right to be free from cruel and unusual punishment under the

Eighth Amendment, and his right to equal protection of the laws under the

Fourteenth Amendment. Docket 1 ¶ 164; Docket 8-1 ¶ 29.

### (1)      ADA Claims

Cody alleges that he has been discriminated against because of his

disability in violation of the ADA. Docket 1 ¶ 164; Docket 8-1 ¶ 29. Title II of

the ADA states that "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132; *see also Mason v. Corr.

Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). There are various means

of discrimination under the ADA, including intentional discrimination,

retaliation, and the failure to make reasonable accommodations. *See Peebles v.*

*Potter*, 354 F.3d 761, 765 (8th Cir. 2004); *Rinehart v. Weitzell*, 964 F.3d 684,

689 (8th Cir. 2020). To succeed on an intentional discrimination claim or a

failure to provide reasonable accommodations claim, Cody must show:

> (1) that he is a qualified individual with a disability; (2) that he was
> excluded from participation in or denied the benefits of the
> [penitentiary's] services, programs, or activities, or was otherwise
> subjected to discrimination by the [penitentiary]; and (3) that such
> exclusion, denial of benefits, or other discrimination was by reason
> of his disability.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010).

Here, Cody fails to allege facts sufficient to state a claim for intentional

discrimination under the ADA. Intentional discrimination is also known as

disparate treatment. *Peebles*, 354 F.3d at 765. "In disparate treatment cases, a

similarly situated disabled individual is treated differently because of his

disability than less- or non-disabled individuals. The key element is

discriminatory intent." *Id.* at 766 (citing *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 153 (2000)). Cody's diabetes and mobility issues render him

a qualified individual with a disability. *See* 42 U.S.C. § 12102(1) (defining

"disability" under the ADA). Although he claims that he has not been provided

means to obtain pain medication, blood sugar testing, and insulin, he makes

no showing that he has been treated differently because of his disability and no

showing of discriminatory intent. *See* Docket 1 ¶¶ 23-58; Docket 8-1 ¶¶ 1-20.

Thus, Cody's ADA claims for intentional discrimination against Sullivan,

Lengkeek, and Badure in their individual capacities and in their official

capacities for injunctive relief and against Clark and Dreiske in their individual

capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii)

and 1915A(b)(1).

Construing Cody's complaint liberally, he also brings claims for failure to

provide reasonable accommodations in violation of the ADA. *See* Docket 1

¶ 164; Docket 8-1 ¶ 29. He alleges that he was excluded from obtaining

medication, and " 'medical services' . . . at state prisons are benefits within the

meaning of Title II[.]" *Mason*, 559 F.3d at 886 (quoting *Pa. Dep't of Corr. v.

Yeskey*, 524 U.S. 206, 210 (1998)). In order to show that the exclusion was "by

reason of his disability[,]" Cody need not show that the exclusion was

motivated by a discriminatory purpose, only that his exclusion was caused by

his disability. *See Layton v. Elder*, 143 F.3d 469, 470-72 (8th Cir. 1998)

(finding that wheelchair-using plaintiff had been "excluded . . . because of his

disability" when he could not attend a meeting on the inaccessible second floor

of the courthouse, even though there was no showing of intent to discriminate).

Cody alleges that he is excluded from pain medication, blood sugar

testing, and insulin because his mobility issues make him unable to wait in

line and that solutions offered by defendants, such as a walker-chair, do not

address his issues. Docket 1 ¶¶ 48, 50; Docket 8-1 ¶ 16. Thus, Cody's ADA

claims for failure to provide reasonable accommodations against Sullivan,

Lengkeek, and Badure in their individual capacities and in their official

capacities for injunctive relief and against Clark and Dreiske in their individual capacities survive § 1915A screening.

### (2)   Eighth Amendment Claims

Cody claims violations of his Eighth Amendment right to be free from cruel and unusual punishment. Docket 1 ¶ 164; Docket 8-1 ¶ 29. Construing his complaint liberally, he brings claims for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. *See* Docket 1 ¶ 164; Docket 8-1 ¶ 29. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

20

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citation and internal quotation omitted). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, Cody's allegations meet both the objective and subjective components of the standard set by the Eighth Circuit Court of Appeals. *See Dulany*, 132 F.3d at 1239. His diabetes and mobility issues constitute objectively serious medical needs, and he claims that defendants were all aware of these needs and, although he has been prescribed Lyrica for his neuropathy and blood sugar testing and insulin for his diabetes, have failed to provide him a means by which he can obtain his prescribed treatment. *See* Docket 1 ¶¶ 48, 50; Docket 8-1 ¶¶ 4, 16. Thus, Cody's Eighth Amendment claims for deliberate indifference to serious medical needs against Sullivan,

Lengkeek, and Badure in their individual capacities and in their official capacities for injunctive relief and against Clark and Dreiske in their individual capacities survive § 1915A screening.

### (3)    Fourteenth Amendment Claims

Cody alleges violations of his Fourteenth Amendment right to equal protection of the laws. Docket 1 ¶ 164; Docket 8-1 ¶ 29. The equal protection clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike," a protection that applies to prisoners. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 984 (8th Cir. 2004) (quoting *Rouse v. Benton*, 193 F.3d 936, 942 (8th Cir. 1999)). The Eighth Circuit reviews equal protection claims on disability grounds under a rational basis standard. *See More v. Farrier*, 984 F.2d 269, 271 & n.4 (8th Cir. 1993). The plaintiff must show that "(1) [he is] similarly situated with persons who are treated differently by [the penitentiary], and (2) [the penitentiary] has no rational basis for the dissimilar treatment." *Id.* (citing *Moreland v. United States*, 968 F.2d 655, 660 (8th Cir. 1992) (en banc). "In determining whether a disabled inmate is similarly situated to nondisabled inmates, [the Eighth Circuit] has examined whether the disabled plaintiff is equally capable for the purpose at issue." *Hansen v. Rimel*, 104 F.3d 189, 190 (8th Cir. 1997).

Cody alleges sufficient facts to state a claim for violation of his Fourteenth Amendment equal protection rights. He alleges that he is treated differently than other inmates who need medical treatment. Docket 8-1 ¶ 17. In *Hansen*, the Eighth Circuit found that a hearing-impaired inmate was not

"equally capable of accessing a standard telephone" and thus "not similarly situated to hearing inmates for the purpose of using a telephone." 104 F.3d at 190. Here, Cody seeks access to medical treatment, and he is as equally capable of needing and receiving that medical treatment as other inmates. While Cody has been offered medical treatment, he alleges that the means by which treatment is offered effectively denies him access to it. *See* Docket 8-1 ¶¶ 11-17. Although the penitentiary may have a rational basis for the dissimilar treatment, this court cannot evaluate that basis without defendants' response to these claims. Thus, Cody's Fourteenth Amendment equal protection claims against Sullivan, Lengkeek, and Badure in their individual capacities and in their official capacities for injunctive relief and against Clark and Dreiske in their individual capacities survive § 1915A screening.

### b.    Claims Against Sergeant Jeffrey Elton

Cody brings claims against Elton in his individual capacity and in his official capacity for injunctive relief for denying him his accommodated seating in the dining hall in violation of his right to be free from discrimination because of his disability under Title II of the ADA, his Eighth Amendment right to be free from cruel and unusual punishment, his Fourteenth Amendment right to equal protection of the laws, and his First Amendment right to be free from retaliation. Docket 1 ¶ 165.

### (1)    ADA Claims

Cody alleges that Elton has discriminated against him in violation of the ADA. *Id.* He claims that Elton was made aware of his disability and still refused

23

him his accommodations, forcing him to miss meals supervised by Elton. *Id.*
¶¶ 65-72. He further claims that these actions were motivated by his disability.
*Id.* ¶ 73. Cody alleges facts sufficient to state a claim for intentional
discrimination under the ADA, and his intentional discrimination claim against
Elton in his individual capacity and in his official capacity for injunctive relief
survives § 1915A screening.

Construing Cody's complaint liberally, he also brings claims against
Elton for failure to provide reasonable accommodations in violation of the ADA
and for retaliation in violation of the ADA. *Id.* ¶ 165. Cody alleges that he was
excluded from meals because Elton refused him his accommodations. *Id.*
¶¶ 66-72. Thus, Cody has alleged facts sufficient to state a claim for failure to
provide reasonable accommodations against Elton in his individual capacity
and in his official capacity for injunctive relief, and this claim survives § 1915A
screening.

Title V of the ADA prohibits discrimination against "any individual
because such individual has opposed any act or practice made unlawful by [the
ADA.]" 42 U.S.C. § 12203(a). To succeed on a retaliation claim under the ADA,
a plaintiff must establish that "(1) he engaged in statutorily protected activity;
(2) adverse action was taken against him; and (3) a causal connection exists
between the adverse action and protected activity." *Rinehart*, 964 F.3d at 689.
Here, Cody alleges facts sufficient to state a claim for ADA retaliation against
Elton. He claims that Elton refused him his accommodations in the dining hall
and that Elton did so because of prior conflicts between him and Elton

regarding his accommodations in the dining hall. Docket 1 ¶¶ 66-73. Thus, Cody's ADA retaliation claim against Elton in his individual capacity and in his official capacity for injunctive relief survives § 1915A screening.

### (2)    Eighth Amendment Claims

Cody claims that Elton violated his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* ¶ 165. Construing his complaint liberally, he claims that Elton was deliberately indifferent to conditions of confinement that violated his Eighth Amendment rights. *See id.*

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer*, 511 U.S. at 832). The United States Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation and internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted).

In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to inmate health or safety. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998)

25

(citing *Farmer*, 511 U.S. at 834). An Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981). Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *See id.*; *see also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir. 1989).

Here, Cody alleges sufficient facts to state claims for deliberate indifference to conditions of confinement in violation of his Eighth Amendment rights. He claims that Elton knowingly deprived him of food, a basic human need. *See* Docket 1 ¶¶ 66-72; *Helling*, 509 U.S. at 32. Thus, Cody's Eighth Amendment conditions of confinement claim against Elton in his individual capacity and in his official capacity for injunctive relief survives § 1915A screening.

### (3)   Fourteenth Amendment Claims

Cody claims that Elton violated his Fourteenth Amendment right to equal protection of the laws. *Id.* ¶ 165. He claims that Elton has treated him differently than similarly situated nondisabled inmates by refusing him dining hall accommodations. *See id.* ¶¶ 66-72. Cody is similarly situated to nondisabled inmates because he is as equally capable of eating as they are. *See Hansen*, 104 F.3d at 190. As above, this court cannot evaluate Elton's basis for the dissimilar treatment without defendants' response to these claims. Thus, Cody's Fourteenth Amendment equal protection claim against Elton in his

individual capacity and in his official capacity for injunctive relief survives
§ 1915A screening.

### (4)    First Amendment Claims

Cody alleges that Elton retaliated against him in violation of his First
Amendment rights. Docket 1 ¶ 165. To allege a First Amendment retaliation
claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the
government official took adverse action against him that would chill a person of
ordinary firmness from continuing in the activity, and (3) the adverse action
was motivated at least in part by the exercise of the protected activity." *Spencer
v. Jackson County*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v.
Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). "[T]he plaintiff must show the
official took the adverse action because the plaintiff engaged in the protected
[activity]." *Revels*, 382 F.3d at 876.

Here, Cody alleges facts sufficient to state claims for retaliation in
violation of his First Amendment rights. Cody alleges that after Elton denied
him his dining hall accommodations, he complained to Perrett about the issue.
Docket 1 ¶ 65. The Eighth Circuit has held that "[t]he right to be free from
retaliation for availing one's self of the prison grievance process [is] clearly
established[.]" *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (citing
*Nelson v. Shuffman*, 603 F.3d 439, 449-50 (8th Cir. 2010)). Although Cody did
not file a formal grievance, he alerted a penitentiary officer to the problem with
Elton in hopes of resolving it. Docket 1 ¶ 65. Thus, he engaged in
constitutionally protected speech. Elton's actions in denying Cody access to

food would chill a person of ordinary firmness from continuing in the protected activity, and Cody alleges that Elton was motivated by the results of Perrett and Hanson's investigation, which was spurred by Cody's complaint. *See id.* ¶¶ 67-73. Cody's First Amendment retaliation claim against Elton in his individual capacity and in his official capacity for injunctive relief survives § 1915A screening.

### c.   Health Services Waiting Room COVID-19 Protocol Claims

Cody brings claims against Fenolio and John/Jane Does #2(b) in their individual capacities and in their official capacities for injunctive relief for failing to impose masking or social distancing requirements in the Health Services waiting room in violation of his right to be free from discrimination because of his disabilities under Title II of the ADA, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment right to equal protection of the laws. *Id.* ¶ 166.

### (1)   ADA Claims

Cody alleges discrimination in violation of Title II of the ADA. *Id.* Cody makes no showing that he was treated differently than nondisabled inmates while at the Health Services waiting room, only that the lack of COVID-19 protocols in the waiting room endangered him. *See id.* ¶¶ 77-83. Construing his complaint liberally, Cody also claims that Fenolio and John/Jane Does #2(b) failed to provide reasonable accommodations in violation of the ADA. *Id.* ¶ 166. Although Cody may have desired waiting room accommodations that

put him less at risk of contracting COVID-19, he does not allege that he was excluded from any "services, programs, or activities" through the waiting room's lack of COVID-19 protocols, only that they put him at risk. *See id.* ¶¶ 77-83. Thus, his ADA claims for intentional discrimination and for failure to provide reasonable accommodations against Fenolio and John/Jane Does #2(b) in their individual capacities and in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (2)   Eighth Amendment Claims

Cody claims violations of his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* ¶ 166. Construing his complaint liberally, he brings claims for deliberate indifferent to conditions of confinement in violation of his Eighth Amendment rights. *See id.* Under *Helling*, reasonable safety is a basic human need. 509 U.S. at 32. An Eighth Amendment remedy was required when inmates were held in small cells where some inmates had infectious diseases, even though not all of those exposed to the disease became infected. *Hutto v. Finney*, 437 U.S. 678, 682-83, 687-88 (1978). Again, this court must examine the totality of the circumstances when considering an Eighth Amendment challenge to conditions of confinement. *Villanueva,* 659 F.2d at 854.

Here, Cody alleges facts sufficient to state claims for deliberate indifference to conditions of confinement in violation of his Eighth Amendment rights. Cody alleges that Fenolio and John/Jane Does #2(b) knew of the risk

29

posed to Cody by COVID-19 and did not take reasonable efforts to mitigate that risk. Docket 1 ¶¶ 77-83. Given the totality of the circumstances, including Cody's medical conditions, the lack of masking and social distancing could have posed a substantial risk of serious harm to Cody. *See id.* Thus, his Eighth Amendment conditions of confinement claim against Fenolio and John/Jane Does #2(b) in their individual capacities and in their official capacities for injunctive relief survives § 1915A screening.

### (3)    Fourteenth Amendment Claims

Cody claims violations of his Fourteenth Amendment right to equal protection of the laws. *Id.* ¶ 166. Cody does not allege that he was treated differently than similarly situated inmates, only that the conditions in the Health Services waiting room put him at risk. *See id.* ¶¶ 77-83. Thus, his Fourteenth Amendment equal protection claim against Fenolio and John/Jane Does #2(b) in their individual capacities and in their official capacities for injunctive relief is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### d.    Quarantine Conditions Claims

Cody brings claims against Sullivan, Ponto, and John/Jane Does #2(c) in their individual capacities and in their official capacities for injunctive relief, against Clark and Reisch in their individual capacities, and against Wasko in her official capacity for injunctive relief for imposing quarantine conditions in violation of his right to be free from discrimination because of his disabilities under the ADA, his Eighth Amendment right to be free from cruel and unusual

punishment, and his Fourteenth Amendment right to equal protection of the laws. *Id.* ¶ 167.

### (1)   ADA Claims

Cody alleges discrimination in violation of Title II of the ADA. *Id.* Cody makes no showing that he was treated differently than nondisabled inmates while quarantined, only that the quarantine protocols endangered him. *See id.* ¶¶ 87-136; Docket 8-1 ¶ 24. Construing his complaint liberally, Cody also claims that Clark, Sullivan, Ponto, Reisch, and John/Jane Does #2(c) failed to provide reasonable accommodations in violation of the ADA. Docket 1 ¶ 167. Cody alleges that the conditions of his quarantine worsened his health issues, but he does not allege that he was excluded from any "services, programs, or activities" by the quarantine conditions. *See id.* ¶¶ 87-136; Docket 8-1 ¶ 24. Thus, Cody's ADA claims for intentional discrimination and for failure to provide reasonable accommodations against Sullivan, Ponto, and John/Jane Does #2(c) in their individual capacities and in their official capacities for injunctive relief, against Clark and Reisch in their individual capacities, and against Wasko in her official capacity for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (2)   Eighth Amendment Claims

Cody claims violations of his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* ¶ 167. Construing his complaint liberally, he brings claims for deliberate indifference to conditions of confinement in violation of his Eighth Amendment rights. *See id.* Here, Cody alleges facts

31

sufficient to state claims for deliberate indifference to conditions of confinement in violation of his Eighth Amendment rights. Cody alleges that, given his medical issues, the conditions of his quarantine posed serious risks to his health and that Clark, Sullivan, Ponto, Reisch, and John/Jane Does #2(c) ignored these risks despite his efforts to bring the risks to their attention. *See id.* ¶¶ 87-136; Docket 8-1 ¶ 24. Thus, Cody's Eighth Amendment conditions of confinement claim against Sullivan, Ponto, and John/Jane Does #2(c) in their individual capacities and in their official capacities for injunctive relief, against Clark and Reisch in their individual capacities, and against Wasko in her official capacity for injunctive relief survives § 1915A screening.

### (3)     Fourteenth Amendment Claims

Cody claims violations of his Fourteenth Amendment right to equal protection of the laws. *Id.* ¶ 167. Cody does not allege that he was treated differently than similarly situated inmates, only that the conditions of his quarantine caused him harm. *See id.* ¶¶ 87-136; Docket 8-1 ¶ 24. Thus, his Fourteenth Amendment equal protection claim against Clark, Sullivan, Ponto, Reisch, and John/Jane Does #2(c) in their individual capacities and in their official capacities for injunctive relief is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### e.     Economic Impact Payment Garnishment Claims

Cody brings claims against Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their

32

individual capacities for garnishing his economic impact payments in violation of the Consolidated Appropriations Act, the Fifth Amendment's protections against the taking of private property for public use, his Fourteenth Amendment due process rights, and his Fourteenth Amendment right to equal protection of the laws. Docket 1 ¶ 168; Docket 8-1 ¶ 31; Docket 12-1 ¶ 13.

### (1)    Consolidated Appropriations Act Claims

Cody alleges that the economic impact payment garnishment violates the Consolidated Appropriations Act. Docket 12-1 ¶ 13. In order to bring a claim under § 1983 for violation of a federal statute, a plaintiff must show that the statute "confer[s] rights on a particular class of persons." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (alteration in original) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284.

Cody cites § 272 of the Consolidated Appropriations Act, which provided economic impact payments. *See* Docket 12-1 ¶ 13. In a note to 26 U.S.C. § 6428A, the Consolidated Appropriations Act included the following language: "[N]o applicable payment shall be subject to, execution, levy, attachment, garnishment, or other legal process, or the operation of any bankruptcy or insolvency law." Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1972 (Dec. 27, 2020). Cody argues that the application of his economic impact payments to his debts violated the Consolidated Appropriations Act. *See* Docket 12-1 ¶ 13.

Cody also argues that his Coronavirus Aid, Relief, and Economic Security Act and Consolidated Appropriations Act payments were mislabeled by the penitentiary as a tax refund, rendering them subject to garnishment, and that he could not have received a tax refund because he has not paid income taxes since before 1977. Docket 1-1 at 64. In a response to a letter written by Cody on this issue, a DOC official explained that "If an inmate did not receive an [economic impact payment] in the form of a check from the United States Treasury with a memo line containing 'Economic Impact Payment,' the inmate had the option to file a 2020 tax return and claim the Recovery Rebate Credit[.]" *Id.* at 65. The letter included a page from the IRS website explaining that "the 2020 Recovery Rebate Credit can be reduced to pay debts owed to other Federal government agencies . . . as well as to state agencies." *Id.* at 66.

The Western District of Michigan has found that § 272 of the Consolidated Appropriations Act "would seem to fairly imply the right to a private cause of action." *Beal v. Davids*, 2021 WL 2934835, at *5-6 (W.D. Mich. July 13, 2021). The *Beal* court allowed a similar claim to go forward for purposes of screening. *See id.* This court finds *Beal* instructive and finds that Cody states a claim for which relief can be granted under § 1983 and the Consolidated Appropriations Act. The Consolidated Appropriations Act grants a property interest in economic impact payments and provides safeguards that protect that property interest from garnishment, as well as reduction or offset under certain federal statutes. *See* Consolidated Appropriations Act of 2021, 134 Stat. at 1972. Thus, Cody's Consolidated Appropriations Act claim against

34

Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their individual capacities survives § 1915A screening.

### (2)    Fifth Amendment Takings Clause Claims

Cody alleges that the garnishment of his economic impact payments violated the takings clause of the Fifth Amendment. Docket 1 ¶ 168. Under the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has explained that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019). "[C]onsideration other than cash . . . may be counted in the determination of just compensation." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 151 (1974) (citing *Bauman v. Ross*, 167 U.S. 548, 584 (1897)). "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Winnebago Tribe of Neb.*, 542 F.2d 1002, 1006 (8th Cir. 1976) (quoting *United States v. Miller*, 317 U.S. 369, 373 (1943)).

An Eastern District of Arkansas court recently considered the application of the takings clause to the garnishment of economic impact payments. *Hayes v. Graves*, 2022 WL 822881, at *5-6 (E.D. Ark. Mar. 16, 2022). The *Hayes* court found that "prisoners are provided with a dollar-for-dollar benefit when

35

their stimulus funds are used to pay off their existing court fines, fees, costs, or restitution." *Id.* at *5 (citation and internal quotation omitted). But when garnished stimulus funds are "diverted to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account[,]" the takings clause is violated. *Id.* at *6.

This court finds *Hayes* instructive in holding that prisoners receive just compensation when stimulus funds are put towards existing court fines, fees, costs, or restitution. *Id.* Further, this principle applies when stimulus funds are put towards debts owed to the penitentiary, because the prisoner receives a reduction in debt owed. *See id.* Here, Cody alleges that $1,550.99 was garnished from his economic impact payments as "obligation payments[.]" *See* Docket 1 ¶ 146. An account balance attached to Cody's complaint shows that obligation payments were applied to a commissary loan, an inmate charges loan, and two medical co-pay loans. Docket 1-1 at 57-58. The account balance also shows a Prison Litigation Reform Act payment, $720.42 paid towards "costs incurred in DOC[,]" and $218.50 paid towards "cost of incarceration." *Id.*

This court cannot determine whether the payments made to "costs incurred in DOC" and "cost of incarceration" reflect a reduction in debt owed. The account balance lists "unlimited" as the amount owed for "cost of incarceration[,]" suggesting that the amount Cody could pay for "cost of incarceration" has no limit and that these payments would not reduce the debt owed. *Id.* at 57. Because this court cannot say with certainty that all obligation payments made from Cody's economic impact payments provided him with a

36

dollar-for-dollar benefit, Cody's Fifth Amendment takings clause claim against Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their individual capacities survives § 1915A screening.

### (3)    Fourteenth Amendment Due Process Claims

Cody alleges that the garnishment of his economic impact payments violated his Fourteenth Amendment right to due process. Docket 1 ¶ 168. Under the Fourteenth Amendment, a "state [cannot] deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. An intentional deprivation of property does not violate due process if there is an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). But when "the property deprivation is effected pursuant to an established state procedure[,]" a post-deprivation state remedy does not satisfy due process. *Id.* at 534 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)).

In *Mahers v. Halford*, the Eighth Circuit addressed whether a prison's "across-the-board policy of deducting twenty percent from money received by inmates from outside sources" and paying that money towards criminal restitution violated inmates' procedural due process rights. 76 F.3d 951, 954 (8th Cir. 1996). Because the Eighth Circuit found that inmates had a property interest in the money, it considered the following factors to determine the

process that was due before the money could be applied to restitution

obligations:

> 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedures; and 3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). After balancing

these factors, the *Mahers* court held that there was no violation of the due

process clause. *Id.* at 956. *Hayes* analyzed the garnishment of economic impact

payments under due process protections and found that *Mahers* "is

authoritative as to restitution and highly persuasive as to court fines, fees, and

costs." *Hayes*, 2022 WL 822881, at *6 (citation omitted). The *Hayes* court

followed its ruling on the takings clause issue, finding that procedural due

process was satisfied for confiscated economic impact payments put towards

restitution, court fines, fees, and costs but not for payments put towards other

funds. *Id.*

This court again finds *Hayes* instructive. Cody alleges that the

penitentiary followed an established state procedure in deducting money from

his economic impact payments, and thus a post-deprivation state remedy, such

as a state-law claim for conversion under SDCL § 21-3-3, does not satisfy due

process. *See* Docket 1-1 at 65 (explaining that Cody's economic impact

payment was "appropriately processed by the Finance Office per DOC

policy[.]"). To the extent that Cody claims a due process violation for economic

38

impact payments put towards restitution, court fines, fees, and costs, he fails to state a claim. But because this court cannot determine that all deducted economic impact payments went towards restitution, court fines, fees, and costs, Cody's Fourteenth Amendment due process claim against Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their individual capacities survives § 1915A screening.

### (4)   Fourteenth Amendment Equal Protection Claims

Cody alleges that his right to equal protection of the laws under the Fourteenth Amendment has been violated by the garnishment of his economic impact payments. Docket 1 ¶ 168. Specifically, he alleges that smaller amounts have been deducted from other inmates' economic impact payments, including only $750 from fellow inmate David Bradley. Docket 8-1 ¶ 27; Docket 12-2 at 7. Again, the government is required to "treat similarly situated people alike" under the equal protection clause. *Murphy*, 372 F.3d at 984 (quoting *Rouse*, 193 F.3d at 942).

Here, Cody fails to claim that he has been treated differently than similarly situated inmates. Although he claims that other inmates have had different amounts deducted from their economic impact payments, he makes no showing that they have similar financial obligations. *See* Docket 8-1 ¶ 27; Docket 12-2 at 7. Because deductions are based on the various financial obligations that a prisoner has incurred, Cody must show that he has similar

debts to other prisoners in order to claim that they are similarly situated. *See Murphy*, 372 F.3d at 984 (requiring plaintiff to "identify the characteristics of the class he claims to be similarly situated to"). Thus, Cody's Fourteenth Amendment equal protection claim against Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their individual capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### f.      Claims Against Dr. Mary Carpenter

Cody brings claims against Dr. Carpenter in her individual capacity and in her official capacity for injunctive relief for denying him medical care in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Docket 1 ¶ 169. Construing his complaint liberally, he claims that Dr. Carpenter has been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. *See id.* Again, a plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany*, 132 F.3d at 1239 (citing *Coleman*, 114 F.3d at 784)). Allegations of negligence and mere disagreement with treatment decisions are not deliberate indifference. *See Jolly*, 205 F.3d at 1096 (citing *Estate of Rosenberg*, 56 F.3d at 37).

Here, Cody alleges facts sufficient to state a claim for deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

His worsening vocal cord condition, as alleged, is a serious medical need.

Although his claim may be mere disagreement with treatment decisions, he

alleges that Dr. Carpenter is aware of his serious medical need and refuses to

address it. *See* Docket 1 ¶¶ 159, 161-162. Thus, Cody's Eighth Amendment

claim for deliberate indifference to serious medical needs against Dr. Carpenter

in her individual capacity and in her official capacity for injunctive relief

survives § 1915A screening.

### g.    Noise Claims

Construing his complaint liberally, Cody brings claims against Badure,

Rotert, and Sullivan in their individual capacities and in their official capacities

for injunctive relief for noise levels at Federal Hall that deprive him of sleep in

violation of his rights under Title II of the ADA, his Eighth Amendment right to

be free from cruel and unusual punishment, and his Fourteenth Amendment

right to equal protection of the laws. *See* Docket 8-1 ¶ 30; Docket 12-1 ¶¶ 8-

11.[8]

### (1)    ADA Claims

Cody alleges that Badure, Rotert, and Sullivan violated his rights under

Title II of the ADA, but he does not explain under which theories of

---

[8] Cody does not indicate which claims he brings against Rotert, but he alleges
Rotert is responsible for the noise issues. *See* Docket 12-1 ¶¶ 9-11. Further, he
names Rotert in the caption of his second supplemental complaint. *Id.* at 1.
Construing Cody's complaint liberally, this court considers all noise claims
brought against Badure to be brought against Rotert as well. Because Cody
alleges that he brought these claims to Sullivan's attention at the penitentiary,
this court also considers these claims to be brought against Sullivan. *Id.* ¶¶ 10-
11.

discrimination he brings these claims. *See* Docket 8-1 ¶ 30; Docket 12-1 ¶¶ 8-11. Construing his complaint liberally, Cody brings claims against Badure, Rotert, and Sullivan for intentional discrimination and for failure to provide reasonable accommodations. *See* Docket 8-1 ¶ 30; Docket 12-1 ¶¶ 8-11.

Cody fails to allege facts sufficient to state claims for either intentional discrimination or failure to provide reasonable accommodations. An intentional discrimination claim requires Cody to show that he was treated differently than similarly situated nondisabled individuals. *See Peebles*, 354 F.3d at 766. Cody makes no showing of disparate treatment, only that his medical conditions have been exacerbated by the noise in Federal Hall. *See* Docket 8-1 ¶ 26; Docket 12-1 ¶ 8. To state a claim for failure to provide reasonable accommodations, Cody must show that he has been excluded from penitentiary "services, programs, or activities . . . by reason of his disability." *Baribeau*, 596 F.3d at 484. Cody does not allege that he has been excluded from penitentiary services, programs, or activities by the failure to enforce noise rules in Federal Hall. *See* Docket 8-1 ¶¶ 25-26; Docket 12-1 ¶¶ 8-11. Thus, Cody's ADA claims against Badure, Rotert, and Sullivan in their individual capacities and in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### (2)     Eighth Amendment Claims

Cody alleges that Badure, Rotert, and Sullivan violated his Eighth Amendment right to be free from cruel and unusual punishment. Docket 8-1

42

¶ 30; Docket 12-1 ¶¶ 8-11. Construing his complaint liberally, he claims that Badure, Rotert, and Sullivan were deliberately indifferent to conditions of confinement that violated his Eighth Amendment rights. *See* Docket 8-1 ¶ 30; Docket 12-1 ¶¶ 8-11. Again, the plaintiff must show that the conditions rise above mere discomfort and are inhumane. *Williams*, 49 F.3d at 445 (citing *Farmer*, 511 U.S. at 832). Only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *McMillian*, 503 U.S. at 9 (citation and internal quotation omitted).

Here, Cody fails to allege facts sufficient to state a conditions of confinement claim. Noisy televisions do not rise above discomfort to inhumane conditions. Further, although Cody may not be satisfied with Badure's recommendation that he speak with an officer when televisions are too loud, this shows that Badure has not been deliberately indifferent to the issue. *See* Docket 8-1 ¶ 25. Similarly, Rotert assured Cody that he had not heard escalating noise in Federal Hall late at night and that he would discuss the issue with Badure, and Sullivan told Cody that he had delegated this issue to Rotert. Docket 12-1 ¶ 11. Thus, Cody's Eighth Amendment conditions of confinement claims against Badure, Rotert, and Sullivan in their individual capacities and in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### (3)   Fourteenth Amendment Claims

Cody alleges that Badure, Rotert, and Sullivan violated his Fourteenth Amendment right to equal protection of the laws. *See* Docket 8-1 ¶ 30; Docket 12-1 ¶¶ 8-11. To bring an equal protection claim on the basis of disability, the plaintiff must show that "(1) [he is] similarly situated with persons who are treated differently by [the penitentiary], and (2) [the penitentiary] has no rational basis for the dissimilar treatment." *More*, 984 F.2d at 271 (citing *Moreland*, 968 F.2d at 660). Here, Cody fails to show that he has been treated differently than similarly situated persons because other inmates in Federal Hall are exposed to the same noise of which he complains. *See* Docket 8-1 ¶¶ 25-26. Thus, Cody's Fourteenth Amendment equal protection claims against Badure, Rotert, and Sullivan in their individual capacities and in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

## II.   Motion for Temporary Restraining Order and Preliminary Injunction

Cody filed a motion for a preliminary injunction. Docket 4. "A preliminary injunction is an extraordinary remedy[.]" *Roudachevski v. All–American Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Hughbanks v. Dooley*, 788 F. Supp. 2d 988, 992 (D.S.D. 2011). "The burden of proving that a preliminary injunction should be issued rests entirely with the movant." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (citation omitted).

When ruling on a preliminary injunction, the court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between

this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Since *Dataphase*, the Eighth Circuit has "observed that the 'likelihood of success on the merits is most significant.' " *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)).

Further, The Eighth Circuit has held that "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). "To demonstrate irreparable harm, a plaintiff must show that the harm is 'certain, great and of such imminence that there is a clear and present need for equitable relief.' " *Gard v. Dooley*, 2014 WL 4243586, at *1 (D.S.D. Aug. 26, 2014) (quoting *Packard Elevator v. Interstate Com. Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986)). A "plaintiff must make a showing of actual, substantial harm resulting from the alleged infringement." *Gard*, 2014 WL 4243586, at *1 (quoting *Travelers Express Co. v. Transaction Tracking Techs., Inc.*, 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003)).

Moreover, "in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " *Goff*, 60 F.3d at 520 (quoting *Rogers v. Scurr*, 676 F.2d 1211,

45

1214 (8th Cir. 1982)). And "for an injunction to issue 'a right must be violated' and . . . 'the court must determine' whether 'a cognizable danger of future violation exists and that danger must be more than a mere possibility.' " *Id.* (quoting *Rogers*, 676 F.2d at 1214).

Here, it is too early in the case to determine that Cody is likely to prevail on the merits. Cody's allegation that he has been denied medication and treatment, which expose him to risk of serious harm, are serious allegations. But at this stage, they are supported only by his complaint. As a result, his motion for a preliminary injunction is denied at this time, but the court will reconsider it upon motion of Cody after defendants respond to Cody's complaint.

Cody also moves for a temporary restraining order. Docket 4. Under the Federal Rules of Civil Procedure, a court may issue a temporary restraining order without notice to the adverse party only if "specific facts . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[.]" Fed. R. Civ. P. 65(b)(1)(A). This court denies Cody's motion for a temporary restraining order for the same reason it has denied the motion for preliminary injunction.

Thus, it is ORDERED:

1.   That Cody's claims for money damages against all individual defendants in their official capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

46

2.      That Cody's denial of medical care claims against Sullivan, Lengkeek, and Badure in their individual capacities and in their official capacities for injunctive relief and against Clark and Dreiske in their individual capacities for failure to provide reasonable accommodations in violation of Title II of the ADA, for deliberate indifference to serious medical needs in violation of the Eighth Amendment, and for violation of his Fourteenth Amendment right to equal protection of the laws survive § 1915A screening.

3.      That Cody's claims against Elton in his individual capacity and in his official capacity for injunctive relief for intentional discrimination and failure to provide reasonable accommodations in violation of Title II of the ADA, for retaliation in violation of Title V of the ADA, for deliberate indifference to conditions of confinement in violation of the Eighth Amendment, for violation of his Fourteenth Amendment right to equal protection of the laws, and for retaliation in violation of the First Amendment survive § 1915A screening.

4.      That Cody's claims against Fenolio and John/Jane Does #2(b) in their individual capacities and in their official capacities for injunctive relief for deliberate indifference to conditions of confinement in violation of the Eighth Amendment survive § 1915A screening.

5.      That Cody's quarantine conditions claims against Sullivan, Ponto, and John/Jane Does #2(c) in their individual capacities and in their

47

official capacities for injunctive relief, against Clark and Reisch in their individual capacities, and against Wasko in her official capacity for injunctive relief for deliberate indifference to conditions of confinement in violation of the Eighth Amendment survive § 1915A screening.

6.   That Cody's economic impact payment garnishment claims against Wasko, Sullivan, Benting, Sprinkel, and John/Jane Does #3 in their individual capacities and in their official capacities for injunctive relief and against Clark, Young, Leidholt, and Reisch in their individual capacities for violation of the Consolidated Appropriations Act, for violation of the takings clause of the Fifth Amendment, and for violation of his due process rights under the Fourteenth Amendment survive § 1915A screening.

7.   That Cody's claims against Dr. Carpenter in her individual capacity and in her official capacity for injunctive relief for deliberate indifference to serious medical needs in violation of the Eighth Amendment survive § 1915A screening.

8.   That all of Cody's remaining claims against all defendants are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

9.   That the Clerk shall send blank summons forms and Marshal Service Forms (Form USM-285) to Cody so that he may cause the complaint to be served upon defendants Sullivan, Dreiske,

Lengkeek, Badure, Clark, Elton, Fenolio, John/Jane Does #2(b), Ponto, John/Jane Does #2(c), Reisch, Wasko, Benting, Sprinkel, John/Jane Does #3, Young, Leidholt, and Dr. Carpenter.

10. That Cody shall complete and send the Clerk of Court a separate summons and USM-285 form for defendants Sullivan, Dreiske, Lengkeek, Badure, Clark, Elton, Fenolio, John/Jane Does #2(b), Ponto, John/Jane Does #2(c), Reisch, Wasko, Benting, Sprinkel, John/Jane Does #3, Young, Leidholt, and Dr. Carpenter. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 forms are not submitted as directed, the complaint may be dismissed.

11. The United States Marshal Service shall serve the completed summons, together with a copy of the complaint (Docket 1), the supplemental complaints (Dockets 8-1 and 12-1), and this order, upon defendants Sullivan, Dreiske, Lengkeek, Badure, Clark, Elton, Fenolio, John/Jane Does #2(b), Ponto, John/Jane Does #2(c), Reisch, Wasko, Benting, Sprinkel, John/Jane Does #3, Young, Leidholt, and Dr. Carpenter.

12. Defendants Sullivan, Dreiske, Lengkeek, Badure, Clark, Elton, Fenolio, John/Jane Does #2(b), Ponto, John/Jane Does #2(c), Reisch, Wasko, Benting, Sprinkel, John/Jane Does #3, Young, Leidholt, and Dr. Carpenter will serve and file an answer or

responsive pleading to the complaint on or before 21 days following the date of service or 60 days if the defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

13. Cody will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

14. Cody's motion to amend/supplement complaint and motion for second supplemental complaint (Dockets 8 and 12) are granted.

15. Cody's motion for a preliminary injunction and for a temporary restraining order (Docket 4) is denied.

Dated May 18, 2022.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE