UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

| | |
|---|---|
| WILLIAM CODY,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DOUG CLARK, individual and official capacity; DANIEL SULLIVAN, individual and official capacity; JENNIFER DREISKE, individual and official capacity; BRITTNEY LENGKEEK, individual and official capacity; SAM BADURE, individual and official capacity; JEFFREY ELTON, individual and official capacity; JENNIFER FENOLIO, individual and official capacity; TROY PONTO, individual and official capacity; CHAD ROTERT, individual and official capacity; TIM REISCH, individual and official capacity; DARIN YOUNG, individual and official capacity; JOHN BENTING, individual and official capacity; MIKE LEIDHOLT, individual and official capacity; NYLA SPRINKEL, individual and official capacity; MARY CARPENTER, individual and official capacity; KELLIE WASKO, individual and official capacity;  JOHN/JANE DOES #2(B), individual and official capacity;  JOHN/JANE DOES #3, individual and official capacity; and JOHN/JANE DOES #2(C), individual and official capacity,<br><br>                    Defendants. | 4:22-CV-04010-KES<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART BADURE'S, ROTERT'S, AND SULLIVAN'S MOTIONS FOR SUMMARY JUDGMENT |

---

Plaintiff, William Cody, an inmate at the South Dakota State Penitentiary

(SDSP), filed a pro se civil rights lawsuit under 42 U.S.C. § 1983, alleging,

among other things, that defendants Sam Badure, Chad Rotert, and Daniel Sullivan, violated Cody's Eighth Amendment rights by repeatedly failing to control the noise around Cody's prison cell and thus depriving Cody of sleep for months. *See* Docket 1 ¶¶ 87, 99 (showing Cody's cell), 102, 104, 164; Docket 8-1 ¶ 26; Docket 12-2 at 4-6; *see also* Docket 65 at 6-9 (construing Cody's complaint to include Eighth Amendment conditions of confinement claim based on excessive noise).

Cody sues Badure, Rotert, and Sullivan in their individual and official capacities for injunctive relief and monetary damages. *See* Docket 1; *see also* Docket 65 at 9; Docket 132 at 64.[1] Badure, Rotert, and Sullivan move for summary judgment. Docket 87.[2] Cody opposes defendants' motion. Docket 132. After considering the parties' briefing and the record, the court issues the following order.

---

[1] In Cody's response to defendants' motions for summary judgment, Cody also asserts a claim for monetary damages for "each and every time the noise wakes him from sleep." Docket 132 at 64. Defendants filed a reply to Cody's response but did not specifically argue that Cody's new damages request is improper. *See generally* Docket 141 at 44-50. Thus, seeing no objection and construing Cody's filings liberally, the court also evaluates Cody's request for monetary damages. *See United States v. Sellner*, 773 F.3d 927, 932 (8th Cir. 2014).

[2] Defendants Sam Badure, John Benting, Mary Carpenter, Doug Clark, Jennifer Dreiske, Jeffrey Elton, Jennifer Fenolio, John/Jane Does #2(b), John/Jane Does #2(c), John/Jane Does #3, Mike Leidholt, Brittney Lengkeek, Troy Ponto, Tim Reisch, Nyla Sprinkel, Daniel Sullivan, Kellie Wasko, and Darin Young also move for summary judgment on different counts. Docket 33. Similarly, Cody has filed a cross-motion for partial summary judgment on separate counts. Docket 131. The court addresses these other motions for summary judgment in a different order. For the purposes of this order, the court refers to Badure, Sullivan, and Rotert collectively as "defendants" even though there are other defendants in the case.

## PROCEDURAL BACKGROUND

Cody filed his initial complaint on January 20, 2022. Docket 1. Cody filed two motions to supplement his complaint, and the court granted both motions. Docket 8; Docket 12; Docket 14. The court also screened Cody's complaint (considering the supplemental information) and, among other things, originally dismissed Cody's Eighth Amendment conditions of confinement claims based on excessive noise. Docket 14 at 42-43. Cody moved the court to reconsider this ruling, and the court agreed with Cody, finding that Cody plausibly alleged an Eighth Amendment violation based on excessive noise resulting in sleep deprivation. Docket 65 at 6-9.

## FACTS

Viewing the record[3] in the light most favorable to Cody, the facts are:

Cody is a South Dakota state prisoner incarcerated in the SDSP and has been since 1978. Docket 1 at 1; *id.* ¶ 22.

---

[3] The court treats Cody's verified complaint, verified supplemental complaints, and his verified memorandums as equivalent to affidavits for summary judgment purposes and accepts the facts set forth in such complaints as true. *See Williams v. York*, 891 F.3d 701, 703 n.2 (8th Cir. 2018); *Mack v. Dillon*, 594 F.3d 620, 623-24 (8th Cir. 2010) (reversing summary judgment based on allegations in plaintiff's verified complaint); *see also* Docket 1 at 50 (showing complaint is verified); Docket 8-1 (showing same for supplement); Docket 12-1 (same); Docket 18 at 11 (same); *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992) (defining "verified" as requiring only that the drafter declared under penalty of perjury that the foregoing is true and correct and that the document contains a dated signature); *K Inv., Inc. v. B-Gas Ltd.*, 2021 WL 3477356, *2 (S.D. Tex. June 4, 2021) (same and collecting cases stating the same).

Beginning on November 13, 2021, the SDSP moved Cody into the portion of the prison called EAST Hall (East). *Id.* ¶ 99. For at least the next three months while living in East, Cody endured loud noises during sleeping hours. *See id.* ¶¶ 87 (explaining that East is very loud), 99 (showing that SDSP moved Cody on November 13, 2021), 102 (providing an example of loud noise on a specific date); Docket 8-1 ¶¶ 26 (showing Cody complained about continuous noise in February 2022), 30; Docket 12-2 at 4-6 (showing Cody's complaints in February 2022). Specifically, East was constantly loud from 5:00 a.m. until past midnight on weekdays, and later on the weekends. Docket 1 ¶ 87. For example, on November 14, 2021, inmates next to Cody yelled at each other and nearby televisions were loud from 8:30 p.m. until 2:45 a.m., preventing Cody from sleeping at all. *Id.* ¶ 102. Again on November 18, 2021, the noise outside Cody's cell at 9:45 a.m. "was so noisy due to inmates in EAST yelling at each other, or just to make noise, it was impossible for Cody to think, to concentrate enough to create intelligent paragraphs." *Id.* ¶ 119. These examples are only illustrative, as Cody faced blaring TVs and inmates yelling around him "[m]ost" nights, sometimes at least as late as 1:00 a.m. *Id.* ¶ 130. Even Rotert admits that when inmates randomly sing or yell, their noise tends to "generally echo *though* [sic] *out* the cell hall." Docket 91 ¶ 12 (emphasis added). As a result of the noise, Cody could not sleep. *See* Docket 1 ¶¶ 102, 104, 164; Docket 8-1 ¶ 26.

Furthermore, corrections officers were required to make rounds every half hour and failed to enforce East's rule requiring all inmates to use

4

earphones/earbuds while using the television. Docket 8-1 ¶ 26. For example, on January 10 or 11, 2022, when Cody complained about the noise, a correctional officer told Cody, "We don't have time and they don't pay us enough for that kind of b____ s_____." Docket 18 at 9-10. Not only did the corrections officers fail to enforce these rules, Badure, a SDSP official, also refused to do anything about the noise. On January 26, 2022, Cody told Badure, the North/South Unit Manager about the loud noises. Docket 8-1 ¶ 25. Cody asked Badure if she intended to enforce the rule requiring all inmates to wear earphones/earbuds while using their televisions. *Id.* Badure responded that Cody needed to inform a correctional officer when another inmate watched the television without headphones. *Id.* At this point, correctional officers had already ignored the noises and televisions. *Id.*

On February 1, 2022, Cody again complained to Badure. *Id.* ¶ 26. This time, Cody sent Badure a letter, telling Badure that an inmate next to Cody's cell was not using his headphones/earbuds while using the television throughout the night and during sleeping hours. *Id.*; *see also* Docket 12-2 at 4. Specifically, Cody told Badure that the noise from a television in a nearby unit began "at about 03:20 and continuing at about 0440, 0540, 0640[]" and that it was so loud that Cody could hear the announcer for about 10 to 20 minutes at a time. Docket 12-2 at 4. Cody told Badure that this noise prevented him from sleeping, and that the noise level "ha[d] been steadily increasing this past month . . . ." *Id.* Cody also explained that correctional officers ignored the noise

and walked quickly by it. *Id.* Cody repeated his request that Badure intervene. *Id.* Badure did not respond or address these concerns. *See id.* at 5.

On February 8, 2022, Cody wrote to Associate Warden Chad Rotert, stating that the inmates surrounding Cody were loud and that Badure was failing to control the noise. *See id.* Cody specifically stated that "[t]he yelling between tiers has increased dramatically," and that he "h[ad] been woken during sleeping hours by a TV being used without headphones/[earbuds] – contrary to well posted Unit rule." *Id.* Even with this second letter, neither the correctional officers, Badure, or Rotert had addressed the noise. *Id.* at 6.

On February 23, 2022, Cody wrote a third letter, this time to Sullivan, the Warden of SDSP. *Id.*  In this third letter, Cody explained that he was "inundated with the sleep depriving sound of first one, now two, televisions vibrating through my east wall intermittently throughout the night and early morning." *Id.* Cody had talked with the corrections officers about this problem, but the officers told Cody that "they don't have time to enforce all of the rules, they have other priorities, or they [were] too busy." *Id.*

On February 28, 2022, Warden Sullivan toured the SDSP campus and ran into Cody while Cody was using the computer. Docket 12-1 ¶ 11. Cody introduced himself and asked if either Badure, Rotert, or Warden Sullivan would ever respond to his letters about the noise. *Id.* Warden Sullivan then said that he and Cody should become "pen pals" because of the number of letters Cody had submitted. *Id.* Eventually, Warden Sullivan stated that he had delegated the problems over to Rotert, who was standing nearby. *Id.* Cody then

6

approached Rotert, who told Cody that he "may have some ways" to resolve the noise problems and that he was there in the early hours one night and had not heard the noise. *Id.* Cody then gave another specific example of the noise problem, stating that earlier that morning (February 28, 2022), a television was so loud that it had woken him up around 3:00 a.m. *Id.* Rotert simply told Cody that Rotert would speak with UM Badure. *Id.*

## STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (alteration in original) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)). In reviewing the record, the court views the facts in the light most favorable to the non-moving party. *Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021). While "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient[,]" *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (citation omitted), a party moving for summary judgment is not entitled to summary judgment just because the facts he offers may appear to be more plausible or because the

adversary may be unlikely to prevail at trial, *see Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

## DISCUSSION

### I.    Claims for Injunctive Relief

The court turns to whether the record, viewed in the light most favorable to Cody, can support Cody's Eighth Amendment conditions of confinement claim. "[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The United States Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotation omitted). In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to inmate health or safety. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 834).

### A. Objective Requirement

The Eighth Circuit has recognized that sleep is an identifiable human need, and that depriving an inmate of sleep can violate the Eighth Amendment. *See Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014) ("Sleep is critical to

8

human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") (quoting *Walker v. Schult*, 717 F.3d 119, 126 (2d. Cir. 2013) (cleaned up)); *see also Obama v. Burl*, 477 F. Appx. 409, 411 (8th Cir. 2012) (per curiam) (reversing dismissal of inmate's Eighth Amendment claim based in part on his exposure to "constant lighting" that caused inmate's inability to sleep, emotional distress, and constant headaches); *Cf. Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990) (rejecting prisoner's Eighth Amendment excessive noise and fumes complaint because the noise occurred during the day and did not deprive the prisoner of sleep). Other Circuits have concluded the same. *See Walker*, 717 F.3d at 126 (Second Circuit finding inmate plausibly alleged an Eighth Amendment violation for sleep deprivation caused by his five cellmates making constant and loud noise inside the cell all night); *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d. Cir. 2019); *Safrit v. Stanley*, 2024 WL 414142, at *1-2 (4th Cir. 2024) (holding that prison head count policy that caused inmate to get less than six hours of sleep could support Eighth Amendment claim); *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (finding inmate's complaint of excessive noise occurring "every night, often all night, interrupting or preventing his sleep" was sufficient to state a claim under Eighth Amendment); *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996). And not only have courts generally found that depriving an inmate of sleep can violate the Eighth Amendment, but some of these cases specifically dealt with

claims of sleep deprivation as a result of other inmates making excessive noise. *See, e.g.*, *Walker*, 717 F.3d at 126; *Harper*, 174 F.3d at 720.

This context—excessive noise from other inmates—is the one involved here: Cody alleges that for months, other inmates constantly yelled and blared their television throughout the night, that their actions deprived Cody the ability to sleep, and that defendants did not do anything to address their actions. *See supra*, at 3-7. Contrary to defendants' arguments, Cody has not simply alleged isolated incidents of excessive noise. *See* Docket 88 at 15, 23; Docket 141 at 47-48. Instead, according to Cody, he had to endure excessive noise "most nights" for at least three months, and that he was "inundated" with this noise. *See* Docket 1 ¶¶ 87, 99, 102, 130; Docket 8-1 ¶ 26, 30; Docket 12-2 at 4-6. The fact that the noise occurred for three months weighs heavily in favor of Cody. *See Morris v. King*, 2022 WL 9833541, at *21 (W.D. Ark. July 29, 2022) (finding genuine dispute of material fact for inmate's claims of excessive noise based on thirty days and nights of exposure to other inmates' loud noises).

Contrary to defendants' suggestion, this noise was not merely annoying. Docket 88 at 16. Rather, the inmates' noise was so bad that it woke Cody up repeatedly throughout the night. *See, e.g.*, Docket 1 ¶¶ 102, 119; Docket 12-2 at 4. For example, according to Cody, he would have to face loud noise "at about 03:20 and continuing at about 0440, 0540, 0640[]" and that it was so loud that Cody could hear the announcer for 10 to 20 minutes at a time. Docket 12-2 at 4. Rotert also admitted that when inmates randomly sing or

yell, their noise tends to "generally echo *though* [sic] *out* the cell hall." Docket 91 ¶ 12 (emphasis added). Viewed in the light most favorable to Cody, constantly being woken up in the night for months necessarily deprives Cody of adequate sleep for months. While defendants suggest that the length of these noises (10 to 20 minutes) necessarily shows the noise is insufficient because the noise is not constant, the court disagrees. Even if the noises are not a constant drone of sound, a reasonable factfinder could find that the noise deprived an inmate of sufficient sleep because the noise could be sufficiently loud to interrupt one's sleep repeatedly throughout the night. Needless to say, an individual who is able to only get limited periods of uninterrupted sleep per night for months is deprived of sleep. This deprivation is sufficient to meet the first requirement of the Eighth Amendment. *See Walton*, 752 F.3d at 1120; *Walker*, 717 F.3d at 126; *Mammana*, 934 F.3d at 374; *Safrit*, 2024 WL 414142, at *1-2; *Harper*, 174 F.3d at 720; *Antonelli*, 81 F.3d at 1433; *Keenan*, 83 F.3d at 1090-91.

Resisting this conclusion, defendants cite *Goolsby v. County of San Diego*, 2018 WL 4612963, *6 (S.D. Cal. Sept. 26, 2018), *Report and Recommendation adopted in part and rejected in part*, by *Goolsby v. County of San Diego*, 2019 WL 140792 (S.D. Cal. Jan. 8, 2019) and *Matthews v. Holland*, 2016 WL 3167568, *2-3 (E.D. Cal. June 6, 2016). *See* Docket 88 at 11. But in both cases, the inmates complained of excessive noise from others without providing key facts supporting their allegations. In *Goolsby*, the inmate failed to allege whether the noise was at night, how long the noise occurred, how often

the noise disrupted his sleep, or whether the noise was constant. *See Goolsby*, 2018 WL 4612963, at *6. In *Matthews*, the inmate failed to specify how much sleep he lost and how long the noises persisted. *See Matthews*, 2016 WL 3167568, at *4. Unlike *Goolsby* and *Matthews*, the record here contains evidence answering most of these questions in favor of Cody: that the noise was in the middle of the night, that the noise was loud enough to prevent him from sleeping, and that this noise occurred almost every night for at least three months. Thus, neither *Goolsby* nor *Matthews* alter the court's analysis.

Defendants also cite *Lucien v. Gramley*, 99 F.3d 1142 (Table) (7th Cir. 1996). Docket 88 at 12. But there, the court focused its analysis on whether the noise an inmate faced posed a significant risk of injury to the inmate. *See id.* at 2. The court did not discuss the inmate's allegations of losing sleep. *See generally id.* at 2-3. Rather, the court noted that the inmate failed to submit medical evidence that the noise had damaged his health or any other evidence to show the noise level was excessive. *See id.* at 3. Here, Cody's suit focuses not on the level of noise in of itself, but rather on the effects of the noise: that the noise levels continuously deprived him of sleep. *See* Docket 1 ¶¶ 87, 102, 119, 130; Docket 8-1 ¶ 26, 30; Docket 12-2 at 4-6. Thus, *Lucien* is distinguishable from Cody's case.

Defendants also argue that excessive noise is insufficient to state an Eighth Amendment violation because Cody cannot show that the noise posed an unreasonable risk of serious damage to his future health or safety. *See* Docket 88 at 10-11; Docket 141 at 44-45. In support, defendants cite to *Atkins*

12

*v. Savoie*, 2022 WL 17484366, *5 (W.D. Mich. Dec. 7, 2022), which observed "cases finding an Eighth Amendment violation based on excessive noise have typically 'involved incessant noise throughout the day and night, *which at times was significantly beyond acceptable decibel levels and could have resulted in possible hearing loss.*' " *Id.* (quoting *Kimball v. Bureau of Prisons*, 2013 WL 3098900, at *8 (N.D. Ohio June 19, 2013)). As part of its discussion, *Atkins* acknowledged the inmate's claims that he could not get four hours of uninterrupted sleep, but it concluded that the loud was not "so excessive or pervasive as to pose an objectively serious risk of hearing loss or pain." *Id.* at 5.

The court respectfully disagrees with this analysis. The Eighth Amendment does not require that Cody prove that the *sound in of itself* poses an unreasonable risk of serious damage to his future health or safety—instead, Cody may prevail so long as he proves that objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities. *Simmons*, 154 F.3d at 807. In other words, an Eighth Amendment claim for excessive noise can be based on serious risk of injury to an inmate's hearing (such as hearing loss) *or* an inmate's deprivation of the minimal civilized measures of life's necessities (such as sleep). *See id.*; *see also Tineo v. Fed. Bureau of Prisons*, 2021 WL 689144, at *3 (D.N.J. Feb. 23, 2021) ("High levels of noise are not per se Eighth Amendment violations; a violation requires a risk of injury, *which can include psychological injury stemming from persistent noise and lack of sleep.*" (emphasis added)). Loud noise may not alone cause hearing loss or physical injury to an inmate, but it can still be loud and

13

constant enough that it deprives an inmate of sleep, which is a life necessity. *See Walton*, 752 F.3d at 1120. Deprivation of a life necessity can sufficiently state an Eighth Amendment violation. *See Simmons*, 154 F.3d at 807. Thus, the court rejects defendants' argument to the contrary.

Defendants also point out that Cody failed to allege any physical or health symptoms that he suffered as a result of his sleep deprivation, and that Cody did not specifically allege the severity of his sleep deprivation. *See* Docket 88 at 17-18. Though perhaps Cody could have been more specific about what physical or mental symptoms he experienced from his sleep deprivation, the rules governing the court's construction of Cody's filings allow his claim to survive. First, the court must construe Cody's filings liberally given his *pro se* status. *See Sellner*, 773 F.3d at 932. And second, independent of Cody's *pro se* status, the court must view the record in the light most favorable to Cody, drawing all reasonable inferences in his favor. *See Lissick*, 996 F.3d at 882. One of these rules alone requires the court to resolve inferences in favor of Cody. But both rules combined instruct that the court must be especially careful to do so.

Here, Cody alleged that that the noises caused him to lose sleep "most nights" and that he was "inundated" with the noise. *See* Docket 1 ¶¶ 87, 99, 102, 130; Docket 8-1 ¶ 26, 30; Docket 12-2 at 4-6. Cody also has specifically stated that he was sleep deprived. Docket 12-2 at 6. Furthermore, Cody also alleged that the noise occurred for at least three months. *See* Docket 1 ¶¶ 87 (explaining that East is very loud), 99 (showing that SDSP moved Cody on

November 13, 2021), 102 (providing an example of loud noise on a specific date); Docket 8-1 ¶¶ 26 (showing Cody complained about continuous noise in February 2022), 30; Docket 12-2 at 4-6 (showing Cody's complaints in February 2022). From these factual assertions, which the court accepts as true, and applying the two mentioned rules of construction, it is reasonable for a factfinder to conclude that the constant noise nearly every night for months on end caused him sleep deprivation that deprived him of an identifiable human need. *See Walton*, 752 F.3d at 1120.

Finally, defendants highlight that Cody's medical records reveal he did not complain to healthcare providers about feeling sleep deprived. *See* Docket 88 at 19-20 (citing Dockets 88-7—88-19). But this observation goes more towards the weight the jury should give Cody's assertions rather than proving the absence of any genuine dispute of fact. There are a number of reasons for why Cody may not have reported his sleep deprivation to doctors. Perhaps, as defendants argue, Cody did not experience significant (if any) sleep deprivation. Or perhaps Cody felt it would be useless to complain to his healthcare providers about his sleep because he had already complained about the noise problems repeatedly to correctional officers, Badure, Rotert, and Warden Sullivan. *See* Docket 8-1 ¶ 25; Docket 12-1 ¶ 11; Docket 12-2 at 4-6; Docket 18 at 9-10. Whatever the reason, the factfinder, not the court at this stage, gets to decide. The court rejects defendants' argument to the contrary.

In summary, viewing the record in the light most favorable to Cody, the court finds that a reasonable factfinder could find that defendants deprived

Cody of sleep and that this deprivation was sufficiently serious and frequent to show that defendants objectively "deprive[d] [Cody] of the minimal civilized measures of life's necessities." *Simmons*, 154 F.3d at 807. The court finds the record contains sufficient factual disputes regarding the first prong of Cody's Eighth Amendment claim.

### B. Deliberate Indifference

"To establish deliberate indifference, the plaintiff must show the defendant[s] [were] substantially aware of but disregarded an excessive risk to [Cody's] health or safety." *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004). This requirement does not require that defendants actually believe that their actions would harm the inmate, but rather "it is enough that the official[s] acted or failed to act despite [their] knowledge of a substantial risk of harm." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009) (quoting *Farmer*, 511 U.S. at 842)). Whether or not defendants knew of the continuous noise at night and whether defendants knew that such noise posed a substantial risk of depriving Cody of sleep "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842).

Here, a reasonable factfinder could find that all defendants acted with deliberate indifference. Cody complained to Badure twice: once verbally, and another time in writing. *See* Docket 8-1 ¶ 25; Docket 12-2 at 4. Although Badure told Cody that Cody needed to tell the correctional officers about this

16

problem, Cody had already explained to Badure that the correctional officers had ignored the noise and refused to enforce the noise volume rules. *See* Docket 8-1 ¶ 25. Indeed, one of the correctional officers told Cody "[w]e don't have time and they don't pay us enough for that kind of b____ s____." Docket 18 at 9-10.

Cody also put Badure on written notice roughly a week later, telling Badure that the noise levels had steadily increased and that he could not sleep through the night. Docket 12-2 at 4. Cody also again reiterated that the correctional officers ignored the noise and quickly walked by it. *Id.* Cody requested that Badure intervene. *Id.* But Badure never responded nor addressed these concerns. *Id.* at 5. Construing the record in the light most favorable to Cody, Badure had sufficient information that Cody could not sleep due to the constant noise in the middle of the night, disregarded a substantial risk that Cody was deprived of a life necessity (i.e. sleep), and yet still did nothing about it. Based on this record, a reasonable factfinder could conclude that Badure was "substantially aware of but disregarded an excessive risk to [Cody's] health. . . ." *Revels*, 382 F.3d at 875.

The same is true of Rotert. On February 8, 2022, a week after Cody sent his letter to Badure, Cody wrote to Rotert explaining that nearby television noises had woken Cody up during the night and that none of the correctional officers were enforcing the noise level rules. *See* Docket 12-2 at 4-5. Cody also told Rotert in this letter that he had already submitted a complaint to Badure without any response. *Id.* Still, this letter did not work. *See id.* at 6. In fact,

roughly three weeks later on February 28, 2022, Cody talked to Rotert, who simply stated that he "may have some ways" to resolve the noise problems and that he was there in the early hours one night and had not heard the noise. Docket 12-1 ¶ 11. But during this February 28, 2022, conversation, Cody gave another specific example of the noise problem, stating that earlier that morning, a television was so loud that it had woken him up around 3:00 a.m. *Id.* Rotert simply told Cody that Rotert would speak with UM Badure. *Id.*

Viewing the record in the light most favorable to Cody, a reasonable factfinder could find that Rotert knew of the noise issues and yet failed to do anything about it. Construed in the light most favorable to Cody, Rotert's response that he "may have some ways" to resolve the noise issue highlight that Rotert knew of the noise problem. *See id.* By knowing of these noise issues and how they woke Cody up in the middle of the night, Rotert knew of a substantial risk that Cody was sleep deprived and thus that Cody's health was at substantial risk. *See Revels*, 382 F.3d at 875. Furthermore, Rotert's response that he would speak with Badure is insufficient because, assuming the veracity of Cody's claims, Badure had failed to address the noise concerns and Rotert knew that Badure had not addressed them. Particularly at the summary judgment stage, prison officials may not avoid liability by simply passing off complaints to others, knowing that the new recipients of such complaints will also fail to address the problem. Finally, Rotert's claim that he did not notice the noise does not alter the analysis, both because a reasonable factfinder could not credit this statement, and because such statement does

18

not demonstrate that no material dispute exists about whether he was aware of the noise complaints and of Cody's sleep deprivation. In the end, deliberate indifference is a question of fact, and thus the court finds that a reasonable factfinder could find that Rotert was deliberately indifferent to Cody's sleep deprivation. *See Nelson*, 593 F.3d at 529.

With respect to Sullivan, Cody wrote Warden Sullivan a letter on February 23, 2022 explaining that Cody was "inundated" with television and "sleep depriving sound" throughout the early morning hours. Docket 12-2 at 6. Cody also told Warden Sullivan that the correctional officers, Badure, and Rotert all failed to address the noise. *Id.* In fact, Cody specifically told Warden Sullivan that the officers explicitly told Cody that they would not enforce the rules because they did not have the time and that they had other priorities. *See id.* But instead of addressing these concerns, Warden Sullivan joked about them five days later, telling Cody (in person) that they should become "pen pals" based on the number of letters Cody had submitted. Docket 12-1 ¶ 11. This joke alone, in the wake of Cody's repeated pleas for prison officials to address his sleep deprivation, is sufficient for a factfinder to infer Warden Sullivan acted with deliberate indifference towards Cody.

Additionally, Warden Sullivan then told Cody that Warden Sullivan had delegated the noise problems to Rotert. *Id.* But Cody told Warden Sullivan twice—both in his February 23 letter and in-person—that Cody had already asked Rotert, Badure, and the correctional officers to address the noise, but that no one had responded or done anything about it. *See id.*; Docket 12-2 at 6.

19

Similar to Rotert, a reasonable factfinder could find that Warden Sullivan knew Rotert had failed to address the problem based on Cody's February 23 letter and Cody's verbal assertion, and yet still delegated the task to Rotert, without doing anything else to ensure Rotert or any other official would address the problem. A reasonable factfinder could find Warden Sullivan's actions (and inactions) show that Warden Sullivan acted with deliberate indifference: Warden Sullivan knew of the constant noise overnight, knew that this noise deprived Cody of sleep (and thus knew that this sleep deprivation posed a substantial risk to Cody's health), and still did not do anything to address the problem other than delegate it to someone he knew would also not address it.

Defendants make three primary arguments for why Cody cannot show deliberate indifference. First, defendants argue that "[t]here is nothing in the record to suggest that Defendants 'arranged for excessive noise for the purpose of depriving [Cody] of sleep.' " Docket 88 at 21 (quoting *Ross v. United States*, 2013 WL 5290498, at *2 (N.D. Tex. Sept. 18, 2013)). This argument misunderstands the required mental state of the defendants for Cody's Eighth Amendment conditions of confinement claim. To be sure, prisoners asserting Eighth Amendment violations based on a prison official's actions in response to a prison emergency taken "in haste, under pressure" must prove that defendants acted "maliciously and sadistically for the very purpose of causing harm." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). But this standard does not apply to a conditions of confinement claim. Rather, to prove a conditions of confinement claim, a prisoner need only prove defendants acted with deliberate

20

indifference—which does *not* require defendants acted with the purpose of depriving Cody with sleep. *See id.* at 302-03; *see also Stewart v. Precythe*, 91 F.4th 944, 949 (8th Cir. 2024) (explaining the various mental states required under various Eighth Amendment claims). As discussed above, deliberate indifference only requires that defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Stewart*, 91 F.4th at 949 (quoting *Hodges v. Minn. Dep't of Corr.*, 61 F.4th 588, 592 (8th Cir. 2023)). Thus, defendants' argument that it did not purposefully arrange for Cody to suffer excessive noise is irrelevant to determining whether defendants violated the Eighth Amendment.

Second, defendants argue that Cody cannot prove deliberate indifference because Cody failed to identify the specific source of the noise, that Rotert had told Cody that he did not hear the noise in the early hours of the night, and that defendants had in place policies that required inmates to wear headphones while using any electronic or musical devices. *See* Docket 88 at 21-22; Docket 141 at 45-47; *see also* Docket 12-1 ¶ 11; Docket 88-2 at 2 (showing headphone policy). None of these arguments mandate summary judgment in favor of defendants. Cody's failure to identify the source of the noise is not dispositive: he is presumably locked in a cell at night and thus cannot possibly go outside to determine the noise's source. Furthermore, *where* the noise originated is not the crux of Cody's complaint—rather, the gravamen of Cody's complaint is the *existence* and *severity* of the noise, and its attending

effect of depriving Cody's sleep. Additionally, although Cody does state that Rotert told Cody that Rotert did not observe the noise, as the court discussed above, a jury could decide not to credit Rotert's statement, given Cody's assertions that the noise occurred "most nights" and "inundated" Cody's cell. *See* Docket 1 ¶ 130; Docket 12-2 at 6. Furthermore, the fact that defendants had a policy requiring inmates to wear headphones does not conclusively demonstrate defendants are entitled to summary judgment because the record, viewed in the light most favorable to Cody, shows that defendants failed to enforce the policy, even though Cody repeatedly requested they do so. *See* Docket 12-2 at 4-6.

Third, defendants point to their own affidavits largely contradicting Cody's claims. *See* Docket 88 at 24-25. For example, defendants do not recall Cody ever telling them about the correctional officer's comments about refusing to enforce the noise complaint rule. *See* Docket 89 ¶ 20 (Badure); Docket 90 ¶10 (Sullivan); Docket 91 ¶ 20 (Rotert). Additionally, defendants also assert that Cody did not file additional complaints about the noise after speaking with Sullivan and Rotert on February 28, 2022. *See* Docket 88 at 15, 24-25 (citing Docket 89 ¶ 21 (Badure); Docket 90 ¶ 11 (Sullivan); Docket 91 ¶ 25 (Rotert). But that Cody's affidavits and defendants' affidavits contradict highlight why the record contains genuine disputes of material fact.

In short, the record contains sufficient disputes of material fact on whether defendants acted with deliberate indifference. Importantly, this case does not, for example, involve one in which defendants offered Cody ear plugs

or medication to help sleep. *See Walker v. Nunn*, 456 F. App'x. 419, 424 (5th Cir. 2011) (per curiam). The court denies defendants' motions for summary judgment on Cody's Eighth Amendment claims for injunctive relief against defendants in their individual and official capacity.

## II.   Claim for Damages

The court now turns to Cody's claims for monetary damages. As an initial matter, the Eleventh Amendment bars Cody's claims for money damages against defendants in their official capacities. *See Butterfield v. Young*, 833 F. App'x. 38, 40 n.6 (8th Cir. 2021) (per curiam). Thus, the court grants summary judgment in favor of defendants on Cody's claims for money damage in defendants' official capacity.

Turning to Cody's claims for money damages against defendants in their individual capacities, defendants argue they are entitled to qualified immunity. State officials sued in their individual capacity are immune from liability "unless he or she 'violated a clearly established constitutional or statutory right of which a reasonable official would have known.' " *Montin v. Moore*, 846 F.3d 289, 293 (8th Cir. 2017). This inquiry involves a two-step inquiry: whether the official violated the plaintiff's constitutional or statutory right; and 2) whether that right was clearly established at the time of the violation. *See id.* at 293-94. "If the answer to either question is no, then the [state officials] are entitled to qualified immunity." *Id.* (quoting *Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir. 2011)). In conducting this two-step inquiry, the court must view the facts in the light most favorable to Cody. *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir.

23

2004). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Est. of Nash v. Folsom*, 92 F.4th 746, 757-58 (8th Cir. 2024) (quoting (*Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020)). The Eighth Circuit has stated:

> Clearly established law is not defined "at a high level of generality"; instead "we look for a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."

*Id.* at 758 (quoting *Thurmond*, 972 F.3d at 1011).

Starting with the first requirement, for the reasons outlined above, the court finds that the record, viewed in the light most favorable to Cody, contains sufficient factual disputes regarding whether defendants have violated Cody's Eighth Amendment right. *See supra*, at 8-23. With respect to the second requirement, the court cited a robust consensus of cases, both from the Eighth Circuit and other circuit courts, finding that it clearly established that a prisoner may state a cognizable claim under the Eighth Amendment for excessive noise from other inmates that cause sufficiently severe sleep deprivation. *See supra*, at 8-10. Because Cody's claims against defendants fall comfortably within this framework, the court finds that the record, viewed in the light most favorable to Cody, demonstrates the law was clearly established at the time of defendants' actions. Thus, defendants are not entitled to qualified immunity for Cody's claims against them in their individual capacities.

## CONCLUSION

For these reasons, it is ORDERED that

1) Defendants' motions for summary judgment with respect to Cody's claims against them for injunctive relief, both in their individual and official capacities, are DENIED;

2) Defendants' motions for summary judgment with respect to Cody's claims against them for monetary damages in their official capacities are GRANTED; and

3) Defendants' motions for summary judgment with respect to Cody's claims against them for monetary damages in their individual capacities are DENIED.

Dated March 22, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE